UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 2:18cr116 |
| RANDOLPH M. PRINCE | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Counts One and Two of the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1.     At all times relevant to the pending criminal information and this Statement of Facts, defendant RANDOLPH M. PRINCE ("PRINCE"), also known as "Kaz", was a Lieutenant in the United States Navy (USN) assigned to a Virginia Beach-based naval unit.

2.     At all times relevant to this information, PRINCE had authority to initiate requests for purchases for his military unit.

3.     Virginia Beach, Virginia is in the Eastern District of Virginia.

4.     The purpose of the scheme was for PRINCE and others to personally profit by steering USN contracts for military equipment to specific vendors and sub-vendors, circumventing government contracting rules in doing so, and by certifying to the USN that the sub-vendors had fulfilled their contracts when in fact they had not. several of which were sham companies formed at the direction of PRINCE.

### a. Federal Government Procurement Constructs

5.      The Defense Logistics Agency (DLA) is a Department of Defense agency that provides supplies to the military services and otherwise supports defense procurement of military equipment.

6.      The DLA "Prime Vendor" model is a government procurement construct intended to utilize the private sector's logistical capabilities to simplify the purchasing process for the United States Government. The prime vendor process starts with a contractual agreement between the government and a commercial vendor.

7.      The DLA Prime Vendor model encompasses several discrete contracts and contracting programs within the Prime Vendor network.

8.      Relevant to this Statement of Facts are a particular DLA contract program that requires competitive bidding amongst prime vendors, and the Department of Defense (DOD) Electronic Mall (E-Mall).

9.      DOD E-Mall was an internet based ordering platform meant to provide a full service e-commerce site to government entities requiring finished goods and services at pre-negotiated prices from the commercial marketplace.

10.      The General Services Administration (GSA) administers its own contracting mechanisms through which government agencies can procure goods. One such mechanism within this system is the GSA Security Schedule 84 contract.

11.      The GSA also implements the AbilityOne procurement program. This program offers fair market-priced products and services to the government and is an excepted program under the Competition in Contracting Act (CICA). This means that CICA considers AbilityOne procurements as "other than competitive" procurements.

2

12.     To initiate a procurement through any of the contracting mechanisms described above, USN supply personnel will normally solicit goods for their unit through vendors using E-Mall, or through requests for goods to vendors who are party to either a DLA or GSA contract.

13.     If a vendor cannot directly supply the goods needed, then the vendor may subcontract the business to another entity.

14.     Supply personnel, as representatives of the USN, should neither contact a sub-vendor directly during the active bidding process, nor direct that a vendor use a particular sub-vendor without official justification. Additionally, unit supply personnel and vendor firms should only use the E-Mall system to procure goods available on the E-Mall web platform.

15.     Unit supply personnel do not direct specific prices for quotes made by sub-vendors to prime vendors, or otherwise manipulate the generation of a quote for goods through the vendor.

### b. Official DLA Vendors and Personnel

16.     Contracting Firms 1 and 2 were official DLA vendors at all times relevant to this Statement of Facts.

17.     Contracting Firm 3 is a party to the GSA Security Schedule 84 contract.

18.     For purposes of this Statement of Facts, Firm 1 did business through a DLA contract that required competitive bidding amongst prime vendors, Firm 2 did business through the E-Mall system, and Firm 3 through the GSA Schedule 84 contract and the AbilityOne Program.

19.     PRINCE had personal and professional connections with sales representatives at Firms 1, 2, and 3 through which he did business without adhering to the proper DLA or GSA procurement process requirements.

3



### c. Sub-vendors and Their Personnel

20.     At all times relevant to this information, Clayton Pressley (Pressley), also known as "Brian Johnson," was a Senior Chief Petty Officer in the USN. Since 2012, Pressley has owned, or managed, several businesses to include Fifth Column Solutions Group LLC and Pressley Enterprises, Inc.

21.     PRINCE and Pressley were Navy colleagues in the Virginia Beach area between late 2013 and late 2014.

22.     After discussions with PRINCE, Pressley and Jane Doe registered "Griffin Logistics Group" (GLG) on or about May 20, 2014, with the PRESSLEY-owned Fifth Column Solutions Group as GLG's registered agent.

23.     GLG was a business headquartered in Tucson, Arizona that purported to be a professional services firm providing logistical support and supplies to government agencies. Jane Doe was the CEO of GLG.

24.     All business done by Jane Doe on behalf of GLG took place in Tucson, Arizona.

25.     Pressley was the Chief Operating Officer of GLG until its termination in 2016.

26.     Jane Doe's primary roles at GLG were to generate sales quotes and other documentation on behalf of GLG at the direction of PRINCE and Pressley, and to manage GLG's Wells Fargo Business Checking Account ending in 2744, and four Wells Fargo Business Market Rate Savings Accounts associated with PRINCE, Pressley, Jane Doe, and GLG's taxes, respectively.

27.     GLG purported to act as a vendor of "inert explosive training aids." Certain USN units use and destroy these aids in routine training.

28. In reality, GLG was neither a legitimate vendor of inert training aids, nor any military equipment. GLG maintained no inventory, had no capability, and did not have the requisite approvals to sell equipment to the USN.

29. Also in spring 2014, PRINCE approached two other acquaintances (hereinafter "Associate 1" and "CC") and stated that he was in a position in which he could provide government-contracting opportunities to businesses. PRINCE suggested to Associate 1 that he open a business to which PRINCE could offer contracts for military training equipment.

30. Ultimately, Associate 1 registered "L&K Technology and Logistics" (L&K) on June 3, 2014 with his Chesapeake, Virginia home as the principal office.

31. L&K was a limited liability company purporting to be a professional services firm providing logistical support and equipment to government agencies.

32. Associate 1 and CC would edit, review, or forward fraudulent sales requests, invoices, and packing slips emanating from PRINCE over a business email account using the alias "Dave Freese" at PRINCE's suggestion.

33. Associate 1 handled L&K's money, using a bank account at BB&T Bank in Virginia Beach.

34. In the same way as GLG, L&K acted as a vendor of inert training aids, despite not being a legitimate vendor of anything.

35. On August 11, 2015, CC registered "Wayne Tech and Inert" (Wayne Tech), a Florida Profit Corporation, at the suggestion of PRINCE.

36. CC was Wayne Tech's president, director, and sole employee.

37. Like GLG and L&K, Wayne Tech purported to be a vendor of military training equipment, despite not being a legitimate vendor of anything.

5



### d. The GLG Procurements

38.     Between May 2014, and December 2014, Firms 1 and 2 subcontracted business to GLG for inert training aids on several occasions at PRINCE's direction.

39.     PRINCE was able to direct these subcontracts to GLG through his aforementioned connections within Firms 1 and 2.

40.     GLG executed one purchase with Firm 1, and three with Firm 2.

41.     PRINCE, Pressley, and Jane Doe agreed to divide the profits of these fraudulent purchases amongst themselves for personal gain.

### 1.     The GLG-Firm 1 Sale

42.     On May 15, 2014, Jane Doe sent PRINCE an email stating, "[a]ttached is the quote you requested for the inert training aids.  We have just about everything on hand and can have it all together by Tuesday of next week.  Let me know what else you need for us to proceed. We appreciate the oppurtinity [*sic*] to provide the training aids that you require."

43.     On May 28, 2014, John Doe (a rogue sales representative at Firm 1, and later Firm 3) sent PRINCE an email stating in part "Send the POC and number so I have the company info. Hell...Go ahead and get me a quote rolling made out to [Firm 1]."  PRINCE responded with an email to Jane Doe and Pressley stating "FYI...this is what I was referring to...[John Doe] is ready to work this today!"

44.     On May 29, 2014, PRINCE sent an email to PRESSLEY and Jane Doe asking that they "please copy and paste this into a quote and send to [John Doe] at [Firm 1] as soon as possible."  The email provided a description of four sets of ten inert training aid packages, and associated prices totaling $208,131.90.

45.     The aforementioned purchase was made under a DLA contract that requires that all purchases be subjected to a competitive bidding process. Accordingly, five vendors (including Firm 1) solicited quotes from GLG for the requested items in the hopes of winning the bid through the DLA system.

46.     Ultimately, by June 23, 2014, Jane Doe emailed quotes to each of the prime vendors who requested bids. Jane Doe quoted four of the five vendors a price of $245,713.60, but quoted Firm 1 a price of $208,231.90 (18% lower than the quotes offered to the four other vendors).

47.     PRINCE was aware that GLG was acting in such a way as to ensure that Firm 1 would "win" the bid.

48.     Once the bid was "won" for Firm 1, a representative from Firm 1 (who was uninvolved in the scheme) sent two purchase orders made out to GLG dated June 25, 2014. In each order, PRINCE was listed as the "ship-to" contact name. The representative requested that Jane Doe ensure the accuracy of the order, and provide a delivery date. Jane Doe indicated that the purchase order document looked accurate, and fraudulently confirmed that she would be shipping the items on June 26.

49.     On July 11, 2014, the same representative from Firm 1 emailed Jane Doe asking "[c]ould I please have tracking and copies of the invoices for [the two Firm 1 purchase orders]? Thanks for your help!"

50.     On July 17, 2014, the same representative from Firm 1 again requested tracking information and invoices for the Firm 1 purchases, adding that "[w]e are unable to close the orders out of our system without these items."

51.     On July 25, 2014, the same representative again requested tracking information for the Firm 1 orders, stating "[w]e are unable to process payment without this info."

52.     On July 25, 2014, Jane Doe sent PRINCE an email requesting that PRINCE sign Firm 1's delivery receipts "and put 6/26/14 as delivery date, and maybe throw in a time."

53.     PRINCE complied by signing fraudulent delivery receipts for each purchase order, and indicating a delivery receipt date and time for each of June 26, 2014, at 1430. These receipts fraudulently confirmed two deliveries of inert training aids, $208,231.90-worth in each, for a total purchase of $416,463.80. As PRINCE knew, neither delivery took place.

54.     Jane Doe then sent both delivery receipts to John Doe, along with the email from the Firm 1 representative who had requested tracking information.

55.     John Doe replied to Jane Doe on July 28, 2014 "Thanks [Jane Doe], Kaz didn't give me all the details and now I know why you didn't have tracking numbers. Sorry for the mix up and confusion on my part! I'll talk to him about picking things up when he returns next week."

56.     On July 29, two additional representatives from Firm 1 discussed the resolution of the GLG shipment issues. One representative requested that the other "approve the attached DS invoice asap." Attached to the email was a GLG invoice stamped as "drop-shipped." The other representative then responded "[John Doe] says he spoke with the customer and the customer picked the items up. So we are good to go."

57.     On July 29, 2014, Firm 1 remitted a payment of $416,463.80 to GLG.

58.     GLG deposited this payment into the firm's Wells Fargo business checking account, ending in 2744 on July 30, 2014.



8

59.     Including markups and fees, the USN spent $464,854.80 for the aforementioned
dealings between Firm 1 and GLG despite receiving nothing in return.

## 2.   The GLG-Firm 2 Sales

60.     PRINCE knew two sales representatives at Firm 2 who regularly used "Money
Value Only" (MVO) sales orders in their E-Mall sales to the USN.  These particular sales
representatives described this process to PRINCE in a meeting in October 2013.

61.     To execute a procurement using an MVO, a military command would place a
sales order request with Firm 2 for products available in Firm 2's E-Mall "catalog."

62.     Firm 2 would then take the funds released for the E-Mall purchase, and use them
as a credit balance with which to purchase substitute products *not* available through E-Mall from
a sub-vendor or other third party.

63.     By using MVOs, Firm 2 could provide a military unit with virtually any product
needed, under the guise of a purchase for products in Firm 2's approved catalog.  This process is
known as "product substitution."  Product substitution is prohibited by federal procurement
regulations.

64.     PRINCE knew that all business conducted between GLG and Firm 2 involved
MVOs and product substitution.

65.     On May 15, 2014, Jane Doe sent PRINCE a second version of the same May 15,
2014 email described in paragraph 42, above, stating in part: "Attached is the quote you
requested for the inert training aids."

66.     However, this time the message contained a quote to Firm 2, from GLG,
describing four packages of the same inert training aids, 25 units of each type, for a total
purchase price of $520,329.75.

9

67.     PRINCE responded to this version of Jane Doe's email, indicating that the same Firm 2 sales representatives he had met in 2013 "will be your primary POC for this at [Firm 2]. They are our vehicle for expending funds, [Firm 2], Please see attached. It is ready to go for you. Let me know if you need more info. I am standing by for you to send me your documents."

68.     On May 22, 2014, Pressley (using the alias "Brian Johnson") sent an email to PRINCE stating that he and Jane Doe had spoken with a representative at Firm 2 who requested that GLG provide more detail in their quote regarding the contents of "inert training aid" packages.

69.     On May 27, 2014, PRINCE sent an email to his contacts at Firm 2, carbon copying Jane Doe and Pressley, describing the contents of the training aid packages. In response, Firm 2 requested that Jane Doe compile the described contents into an updated quote.

70.     On June 2, 2014, Firm 2 sent an email to PRINCE explaining that GLG had updated their quotes and that a Firm 2 purchase order was prepared for them.

71.     On June 3, 2014, Firm 2 divided the purchase into eleven smaller purchase orders, and sent these documents to GLG for the quoted training aid packages.

72.     Firm 2 split the GLG purchases because E-Mall does not permit procurements exceeding $100,000.00.

73.     For each of these purchase orders, PRINCE signed packing slips, and circled the items "delivered."

74.     On June 16, 2014, Firm 2 sent an email to PRINCE stating, "The last step is getting an invoice from [GLG]." PRINCE forwarded this email to PRESSLEY and Jane Doe stating, "Figure this out."

75. On June 17, 2014, Firm 2 provided GLG a check in an amount of $520,579.75. GLG deposited this check into its Wells Fargo business checking account ending in 2744 on June 20, 2014.

76. In total, the USN expended $800,369.62 for the aforementioned deal between Firm 2 and GLG. This figure reflects the payment to GLG, and various markups and fees for doing business with Firm 2 through the DLA.

77. On June 20, 2014, PRINCE directed Jane Doe by email to generate a new quote from GLG for inert training aids.

78. On June 23, 2014, PRINCE emailed Firm 2 with new quote documents from GLG, and directed Firm 2 to start "building carts" in E-Mall for the quoted items.

79. Firm 2 proceeded to build carts for various items unrelated to the training aids requested by PRINCE; for example, Firm 2 built an E-Mall cart for 428 "router tables."

80. On June 26, 2014, PRINCE sent an email to Jane Doe explaining that the paperwork for the purchase "has now been accepted and getting processed…should be another week before you send them a PO for it."

81. On or about July 16, 2014, PRINCE emailed Jane Doe and directed her to "[g]o to this website and pull details on the items you quoted. Let me know if this will work…you will have to type them all in as the website won't allow cut and paste." The email directed Jane Doe to the website "www.inertproducts.com/x_ray_screening_products."

82. By July 17, 2014, GLG had received four purchase orders from Firm 2. Ultimately, PRINCE signed illegitimate packing slips for these orders, representing delivery of the items supposedly purchased.

83.    Firm 2 then provided two checks to GLG for the purchase orders associated with this second purchase. The first check paid $353,950.90, and the second paid $152,372.95. These checks totaled $506,323.85. Jane Doe deposited these checks into GLG's Wells Fargo business checking account ending in 2744 on July 29, 2014.

84.    In total, the USN expended $803,551.82 for this second deal between Firm 2 and GLG. This figure reflects the payment to GLG, and various markups and fees for doing business with Firm 2 through the DLA.

85.    On or about October 2014, PRINCE and Jane Doe coordinated with Firm 2 for a third purchase of inert training aids.

86.    PRINCE generated and signed a purchase request form requesting four types of inert training aid packages, several units of each, totaling $240,021.33 worth of goods.

87.    On October 24, 2014, PRINCE again directed Jane Doe to send him a quote made out to Firm 2 for these inert training aids.

88.    On or about October 27, 2014, PRINCE sent an email from his USN email account "Randolph.Prince@navy.mil", in Virginia Beach, Virginia, to Jane Doe in Tucson, Arizona, stating that his connection with Firm 2 "should be calling you today" and that he needed Jane Doe "to get the quote as close to $168,014 without going over."

89.    Jane Doe then sent Firm 2 a quote for GLG inert training aids, totaling $167,164.20.

90.    Firm 2 generated purchase orders and packing slips that PRINCE signed and marked to indicate delivery of the goods ostensibly purchased by the USN from GLG.

12

91.     On November 18, 2014, Firm 2 provided a check to GLG for $167,164.20. On November 19, 2014, this check was deposited into GLG's Wells Fargo business checking account ending in 2744.

92.     In total, the USN expended $264,023.48 for this third deal between Firm 2 and GLG. This figure reflects the payment to GLG, and various markups and fees for doing business with Firm 2 through the DLA.

93.     Including markups and fees, the USN spent $1,867,944.92 for the aforementioned dealings between GLG and Firm 2 despite receiving nothing in return.

94.     PRINCE knew that despite signing for the delivery of each procurement, GLG delivered nothing to the USN.

### e. Fraudulent Procurements with L&K and Wayne Tech

95.     Between on or about August, 2014 and on or about September, 2015, PRINCE, Associate 1, and CC completed four separate fraudulent purchases of L&K inert training aids, emanating from a single original purchase request, using Firm 2 as an intermediary.

96.     Including markups and fees, these purchases caused the USN to spend $280,992.94 despite L&K delivering no product in return.

97.     PRINCE, Associate 1, and CC instead divided the proceeds of L&K's "business" amongst themselves, reserving 30% for business taxes.

98.     Each of these fraudulent sales involving L&K were executed using product substitution and MVOs with Firm 2, and fraudulent documentation signed by PRINCE and sent via email to other perpetrators of the scheme.

99.     Between on or about September 2015, and December 10, 2015 PRINCE, CC, and the same John Doe who had worked on the GLG-Firm 1 procurement, executed a single

fraudulent purchase of Wayne Tech inert training "circuits," using Firm 3 as an intermediary under the auspices of the AbilityOne program.

100.    Including markups and fees, this purchase caused the USN to spend $106,114.50 on Wayne Tech products, despite Wayne Tech delivering no product in return.

101.    PRINCE, CC, and John Doe instead divided the proceeds of the Wayne Tech sale amongst themselves.

102.    The Wayne Tech sale was executed with fraudulent documentation signed by PRINCE. These documents, and others, were sent via email to Wayne Tech and Firm 3.

103.    PRINCE knew that, like the purchases made with GLG, L&K and Wayne Tech would deliver nothing to the USN, despite PRINCE signing documentation suggesting otherwise.

104.    PRINCE knew that GLG, L&K, and Wayne Tech were sham businesses that could not provide the USN with any product whatsoever.

105.    In total, the USN experienced a loss of $2,719,907.16 through fraudulent procurements made with the aforementioned sub-vendors. This loss amount reflects the price paid out to each sub-vendor, and includes various markups and fees for doing business with official vendors through the DLA.

106.    To effect the scheme, PRINCE used, and caused others to use, interstate wire communications, specifically, emails transmitted over the internet, to send messages, purchase orders, invoices, packing slips, and other documents in furtherance of the scheme.

### f. April 7, 2015 Tax Return

107.    In 2014, PRINCE collected $387,550.22 as income in connection with the aforementioned fraudulent USN purchases.

14

108. PRINCE electronically filed a United States Individual Income Tax Return (Form 1040) on April 7, 2015, in Virginia Beach, Virginia.

109. On his 2015 Form 1040, PRINCE reported in Line 22 of the document that his total earned income for that taxable year was $194,467.00, knowing that his total income was substantially higher.

110. PRINCE verified his 2015 Form 1040 with a written declaration that it was submitted under penalty of perjury.

111. PRINCE knowingly and willfully failed to report the $387,550.22 in income earned from the GLG scheme on his April 7, 2015 Form 1040.

G. Zachary Terwilliger
United States Attorney

By: _____

David A. Layne
Special Assistant United States Attorney
Colorado State Bar No. 47989
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number - 757-441-6331
E-Mail Address – david.layne@usdoj.gov

15

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RANDOLPH M. PRINCE, Defendant

I am RANDOLPH M. PRINCE's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
SHAWN CLINE, Attorney for Defendant